THE EASTMAN KODAK COMPANY, Respondent, *v.* HENRY M. REICHENBACH and Others, Appellants.

*Invention, defined — secret process — its use, when open to the world, when restrained by a court of equity.*

The actual creative act of an inventor is recognized as an invention, although he may have called to his assistance the ideas and creations of other parties, provided such ideas and creations are so used as to achieve new results.

When an article manufactured by some secret process, which is not the subject of a patent, is thrown upon the market, the whole world is at liberty to discover what that process is, if it can do so by any fair means, and, when the discovery is thus made, to employ in the manufacture of similar articles the knowledge gained by such discovery; when that is done, the inventor's or manufacturer's property in his process is gone.

When, however, knowledge of such secret process is obtained by any breach of confidence, courts of equity will enjoin the use of such knowledge by parties acquiring the same in that manner.

79 183
4ap574
4ap579
: 79 183
27ap225
79h 183
d 68 AD³291

Where a person is the owner of valuable trade secrets, which were either discovered by an employee, or necessarily disclosed to him while occupying a confidential relation towards the owner, and such employee has agreed to give his employer the exclusive property in and control over such inventions, and thereafter, in violation of such agreement, undertakes to make use of the same in such a manner as to materially injure his employer's business, a court of equity will grant relief and enjoin the employee from making use of such knowledge to the prejudice of his employer.

APPEAL by the defendants, Henry M. Reichenbach and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Monroe on the 17th day of April, 1893, upon the decision of the court rendered after a trial at the Monroe Special Term enjoining and restraining the defendants from using or in any manner divulging or imparting any knowledge or information acquired by them in regard to certain processes, formulæ and appliances belonging to the plaintiff.

The plaintiff, as stated by the court at Special Term, brings this action to restrain the defendants from using or in any manner disclosing or imparting to any one any secret or information as to any processes or formulæ used by the plaintiff in its business of manufacturing photographic supplies, and especially in its business of making emulsion and film, which had been imparted to or acquired or discovered by them while in the employ of the plaintiff or its predecessors in business. The plaintiff is, and since the 5th day of December, 1889, has been, a corporation duly organized, and as such was and is engaged in the business of manufacturing and selling Kodak cameras, photographic films and papers, dry plates and other material and apparatus used in the art of photography, it having succeeded the Eastman Dry Plate Company in the conduct of this business. The defendants were in the employ of the plaintiff, holding responsible and lucrative positions. They were men of education, skill and experience in their respective departments, and their services were of great value to the plaintiff, in whose interests, it is claimed, they, or two of them, Reichenbach and Passavant, had made certain discoveries and inventions which were of great value and which were unknown to the world at large.

While thus employed by the plaintiff the defendants organized a new company, with a large capital, for the purpose of engaging in the same business as that carried on by the plaintiff, and issued a

prospectus of their enterprise, in which the announcement was made that the "Corona Camera Company" had been incorporated for the manufacture and sale of "photographic novelties and specialties," which announcement was followed by a list of some of the leading "specialties and novelties" which it was proposed to manufacture and sell. Among the articles thus enumerated were a "Corona film" and a "bromide paper," the latter of which, it was stated in the prospectus, the projectors of the new company were peculiarly prepared to place upon the market by reason of "having manufactured and sold it for a manufacturer that has, at present, the market monopoly." Upon entering the service of the plaintiff, or its predecessor, the defendants Reichenbach and Passavant executed a written contract by the terms of which it was stipulated that they and each of them should assign and transfer to the company all inventions, discoveries or improvements in photography which they respectively might make, discover or invent while in its employ. There is also evidence tending to show that outside of these contracts it was stipulated on the part of these defendants that they should regard their relation to the company as strictly confidential, and that they should not disclose or make improper use of any secrets of the business. The defendant Milburn occupied the position of traveling salesman for the plaintiff, and, while in one sense his relation to the company was confidential in its character, he had not the same opportunities as the others to acquire information respecting its secret operations — that is, he was not engaged in experimental or formulative investigations.

The plaintiff, upon learning of the intentions of the defendants respecting the formation of a new company, and upon having the contents of their prospectus brought to its notice, discharged them from its employ, and then resorted to a court of equity for the relief which it seeks to obtain through the medium of this action.

*Theodore Bacon*, for the appellants.

*Walter S. Hubbell*, for the respondent.

Judgment appealed from affirmed, with costs on the opinion of ADAMS, J., at Special Term.

The opinion of the Special Term was as follows:

ADAMS, J. :

This case is invested with questions so interesting, and with consequences so important to all the parties interested, as to fully justify the large expenditure of time and labor which has characterized the trial and submission of the same ; and, as introductory to any discussion of the facts or law, the court desires to acknowledge its obligations to counsel for the very elaborate and careful briefs which have been submitted and which in their arrangement of facts and reference to precedents have been helpful beyond measure.

It would seem that an orderly and intelligent disposition of the case can best be accomplished by a review of the several questions of fact involved, in substantially the same connection as they are presented by the pleadings ; and, therefore, the one which demands consideration at the outset relates to the matter of valuable secrets of trade, which the plaintiff claims to be the owner of. Did the plaintiff possess such secrets, processes and appliances, and were the same discovered or invented by the defendants, or either of them, or imparted to them, while occupying confidential relations with the plaintiff ?

That this proposition must be met with an affirmative answer is practically admitted by the defendants, for the very specific allegations upon this branch of the case, which are contained in the plaintiff's complaint, are put in issue but partially, if at all, by the somewhat evasive denial that " *all* of the inventions made by the defendants, or either of them, belong to or are the exclusive property of the plaintiff." But, aside from this concession, the very nature of the business in which the plaintiff is engaged suggests processes, appliances, substances and methods, which must, of necessity, depend for their successful use and operation upon the enforcement of the utmost secrecy ; and the fact that this plaintiff has established and is now conducting this extensive and remunerative business, is of itself evidence so strong as almost to require the court to take judicial notice that discoveries and inventions unknown to the public at large constitute the foundation upon which that business rests. It would be useless to indulge in a further expenditure of time upon a proposition so self-evident, and it must be assumed, therefore, that the plaintiff is and was at the time defendants were in its employ,

the owner of inventions, discoveries and secrets which were its own special property and to which great value attached.

That these inventions or discoveries were (some of them, at least) made by two of the defendants is, as has just been shown, also a conceded fact, and that these same defendants possessed knowledge as to all of them, which was regarded as confidential in its nature, is abundantly established by the evidence in the case. As illustrative of this proposition may be cited those portions of the testimony which show the care and pains which were taken by the defendants to conceal from the curious public, and even from the knowledge of their co-employees, the several processes employed to obtain certain results. Again, men employed in one department were not allowed to go into another department. Ingredients employed in compounding certain mixtures were guarded by lock and key, and the various formulæ were given only to those whose business it was to use them. It would be absurd to claim that the defendants could have been conscious of the precautions thus taken to hedge in the plaintiff's business affairs, without understanding very clearly the meaning of it all, and no conclusion, consistent with sound reason, can be indulged in, other than that which is contended for by the plaintiff, viz., that it was the possessor of certain valuable trade secrets which were confidentially known by or disclosed to the defendants Reichenbach and Passavant.

But, however satisfactorily this fact is made to appear, another, and an equally important one, is, in my judgment, made quite as apparent, and that is, that one or both the parties just named, while in plaintiff's service, made certain valuable discoveries which, under the terms of their employment and by the strict letter of their contract, plaintiff was entitled to the benefit of. As has already been suggested, both Reichenbach and Passavant were chemists of skill and experience. The services of the former were sufficiently valuable to command a salary of $5,000 per annum, in addition to which he had been presented by the company with a quantity of its stock, upon the sale of which he had realized nearly $20,000. Passavant was receiving a salary of $2,500, and both were intrusted with duties and responsibilities of the most delicate and confidential character. Among these duties was that of constantly experimenting, with a view to improving the products of the establish-

ment, and these experiments were continually developing new results which the company was entitled to the sole enjoyment of. This much of the plaintiff's claim is, as I understand it, conceded, but defendants now insist that these results were not in the nature of discoveries, because all the agencies employed to produce them, and even the particular properties of these agencies, or some of them, were already known to the scientific mind; and it is argued that nothing can be invented which already exists, nor can anything be said to be discovered the existence of which is already known. This argument is true, to a certain extent, but it has its limitations. To illustrate, it cannot be truly stated that Alexander Bell invented or discovered electricity, but it may be said, without fear of contradiction, that he did invent the telephone, although it was known long before his day that by means of a continuous current of electricity, both vibration and sound could be transmitted over considerable distances. Again, the existence of aluminum, and its value in the industrial arts, has long been known, but its use has to a very great extent been prevented by the expense involved in its production; and it is within a very recent period that chemists have been able to devise methods by which it can be extracted from the clay so cheaply as to admit of its extensive use. However well known the substance may have been, or the chemicals by the use of which such a result has been accomplished, it cannot be denied that this was a new and valuable discovery. So, in regard to some of the inventions or discoveries claimed as property by the plaintiff. They were obtained by compounding certain well-known ingredients, possessing well-defined properties, but in such a manner as to produce new results, and these results were found to be useful in the manufacture of photographic instruments and supplies, to such an extent as to give the plaintiff great advantage over its competitors. Perhaps the composition which will best illustrate the idea sought to be conveyed, is that which is referred to in the evidence as the "doctor."

The principal ingredient of this composition is an article known the world over as *saponin*, and it is likewise a well-known scientific fact that saponin is useful for the removal of grease. In a certain foreign periodical known as *The British Journal of Photography*, under date of February 13, 1885, appeared an article suggesting that this substance might be used with good effect in

photography. The plaintiff, in its attempt to manufacture a superior article of bromide paper and photographic plates, had experienced considerable difficulty from spots appearing upon the surface of the paper and plates, which were thought by some to be occasioned by grease, while others entertained different theories respecting them. After reading the article above mentioned, which referred only in a general sort of a way to the use of saponin in photography, without specifying that it might have the effect of freeing gelatine emulsion from fat or grease, Reichenbach conceived the idea of employing it for that purpose, and after numerous experiments in which this substance was compounded with others in different proportions, the desired result was obtained, the spots disappeared from the plates and paper, the plaintiff had a remedy for these defects which no rival manufacturer possessed, and the "doctor" came into existence. So important was this result regarded that it was kept under lock and key, and lest it should be discovered by other manufacturers the different ingredients composing it were purchased in the name of a third party. Under these circumstances can it be claimed that the "doctor" is neither a discovery, an invention, nor a valuable secret?

And what is here said respecting this particular substance applies with equal force to some of the other articles claimed by plaintiff to be invested with a proprietary character. The machine used for washing emulsion, although termed by Reichenbach an "ordinary washing machine," turns out to be something more than that. In other words, it is an "ordinary washing machine" so altered and remodeled as to serve a new and altogether different purpose from that for which it was originally designed, and when used in connection with a new method of placing the emulsion, which was also the result of experiments made by Reichenbach, it caused a great saving of time and labor. So, too, the formula known as the "Peerless" appears from the evidence to be a modification or combination of other formulæ which, while doubtless composed of similar ingredients, is so compounded as to produce better results and to give greater satisfaction. And so I might continue through the entire list of articles named by the plaintiff, and show that in some particular, even though a slight and apparently unimportant one, each of them had its superior characteristics and variations,

these characteristics and variations resulting from experiments made by some of plaintiff's officers or agents. But enough has been said to indicate my views respecting this branch of the case, and I am unable to see why they do not coincide with the established rules of all civilized countries respecting inventions and the rights of inventors, the fundamental idea of which is to recognize as an invention the actual creative act of the inventor, although he may have called to his assistance the ideas and creations of other parties, provided such ideas and creations are so used as to achieve new results.

The remaining questions of fact relate to the intentions of the defendants and their probable effect upon the plaintiff's business. That defendants, while in its employ, did organize a new company, which was designed to engage in the same general business as that carried on by the plaintiff, is a fact so clearly established by the proof as to admit of no controversy. Indeed, it is virtually admitted in the answer. It is contended, however, that although it is their design to engage in this business, they do not intend to make use of any inventions, discoveries or secrets in which the plaintiff has any proprietary interest. The real significance of this contention can be better understood, perhaps, when it is borne in mind that the main effort of the defendants from the very outset has been to show that the plaintiff has no such inventions, discoveries or secrets. It would, therefore, seem to follow, as a logical sequence, that if, as a matter of fact, plaintiff did possess valuable secrets and inventions which were either disclosed or discovered while defendants were in its employ, they were to be made use of by this rival organization. And this, I think, is the fair construction to be placed upon the acts, language and conduct of the defendants. Their operations were carried on with the utmost secrecy, and their interviews with Millington and Brownell, as detailed by the last-named parties, were almost ludicrous in this particular. Their "prospectus" is so constructed as to relieve defendants Reichenbach and Passavant from any liability under their contracts, and to make Milburn the responsible party, but the statements therein contained furnish, nevertheless, indubitable proof that the new company is intended to avail itself of certain trade secrets which, as has been shown, are the property of plaintiff. To particularize, the "Corona film" referred to, is said to be "a cut-sheet sensitive photographic film, made by a

*new process ;* " and concerning the " bromide paper," it is represented that the new company is peculiarly strong by reason of the fact that " *we* " have " manufactured and sold it for a manufacturer that has, at present, the market monopoly." Now, inasmuch as Reichenbach and Passavant were in plaintiff's employ when this prospectus was issued, it necessarily follows that the " new process " for manufacturing film and bromide paper was either one that was then in use by plaintiff, or else it was one which had been discovered by them, or one of them, while in plaintiff's employ, and in either case it was the property of the plaintiff. The probability is that the " new process " is the same as that concerning which so much evidence has been given, and which the defendants now insist is in no sense new.

To briefly summarize, then, the established facts of this case, it appears that the plaintiff is the owner of valuable trade secrets, which were either discovered by one or more of the defendants or necessarily disclosed to them while occupying a confidential relation towards the plaintiff ; that as to such trade secrets as were discovered by either Reichenbach or Passavant, they have undertaken and agreed to give plaintiff the exclusive property in and control over the same, and that, in violation of this agreement, they are now proposing to make use of them, or some of them, in such a manner as to materially injure the plaintiff's business.

With these facts established, the application of the legal principles which must govern the disposition of the case does not appear to be a very formidable undertaking. It may be safely assumed at the outset, I think, that whatever remedy plaintiff may have does not reside in a court of law. The very nature of the case, the peculiar character of the injury liable to be inflicted, and the incalculable damages which may possibly result, all show most conclusively that legal relief is totally inadequate for plaintiff's protection, and that its only resort must be to a court of equity. The learned counsel for defendants has contended with all the adroitness and skill at his command — which is but another way of saying that such contention has been put forth with all possible adroitness and skill — that this case is not one of which a court of equity can take jurisdiction, and several authorities, of both English and American courts, are cited in support of this claim. I am constrained, however, to hold that the weight of authority is opposed to his view of the law. The

question presented is an interesting one, and would justify a somewhat analytical review of the cases which bear upon either aspect of it, did time permit, but for the purposes of this adjudication it will be necessary to advert to such only as are deemed conclusive upon this court.

In *Morison* v. *Moat* (9 Hare, 241), which is an English case, it was held that an injunction would issue to restrain the use of a secret in the compounding of a medicine, not being the subject of a patent, and to restrain the sale of such medicine by a party who acquired knowledge of the secret in violation of the *contract* of the party by whom it was communicated and *in breach of trust and confidence.* An appeal was taken from the decision of the vice-chancellor, and in 1852 the case was affirmed by the Court of Chancery, and it was there held that " there is no doubt whatever that where a party who has a secret in a trade employs persons under contract, either express or implied, or under duty express or implied, those persons cannot gain the knowledge of that secret and then set it up against their employer." (*Morrison* v. *Moat*, 21 L. J. [N. S.] Eq. 248.)

In 1868 the Supreme Court of Massachusetts recognized and followed the authority of *Morrison* v. *Moat*, and in the opinion of GRAY, J., the law is thus stated : If a party " invents or discovers and keeps secret a process of manufacture, whether a proper subject for a patent or not, he has not, indeed, an exclusive right to it as against the public, or against those who in good faith acquire a knowledge of it, but he has property in it which a Court of Chancery will protect against one who, in violation of contract and breach of confidence, undertakes to apply it to his own use or to disclose it to third persons. The jurisdiction in equity to interfere by injunction to prevent such a breach of trust, when the injury would be irreparable and the remedy at law inadequate, is well established by authority." (*Peabody* v. *Norfolk*, 98 Mass. 452.) The language above quoted was cited with approval in *Saloman* v. *Hertz* (40 N. J. Eq. 400), and it is almost identical with that employed by elementary writers of recognized standing in discussing the same question. Judge STORY says : " Courts of equity will restrain a party from making a disclosure of secrets communicated to him in the course of a confidential employment, and it matters

not in such cases whether the secrets be secrets of trade, or secrets of title, or any other secrets of the party important to his interests." (2 Story's Eq. 952. See, also, 1 High on Inj. [2d ed.] 15.)

The same doctrine has obtained in this State for at least half a century, and it has been enunciated by a line of decisions which, with a single exception, is unbroken. (*Jarvis* v. *Peck,* 10 Paige, 118; *Hammer* v. *Barnes,* 26 How. 174; *Champlin* v. *Stoddart,* 30 Hun, 300; *Tabor* v. *Hoffman,* 118 N. Y. 30.) The *Champlin* case was decided by the General Term of this department, SMITH, P. J., writing the opinion, in the course of which he takes occasion to say that "a secret of trade is fully recognized in equity as property, the disclosure of which will be restrained by injunction." By a careful reading of the various decisions upon this subject, it will be seen that some are made to depend upon a breach of an express contract between the parties, while others proceed upon the theory that where a confidential relation exists between two or more parties engaged in a business venture, the law raises an implied contract between them that the employee will not divulge any trade secrets imparted to him or discovered by him in the course of his employment, and that a disclosure of such secrets thus acquired is a breach of trust and a violation of good morals, to prevent which a court of equity should intervene. It may also be observed in this connection that the word "property," as applied to trade secrets and inventions, has its limitation, for it is undoubtedly true that when an article manufactured by some secret process, which is not the subject of a patent, is thrown upon the market, the whole world is at liberty to discover, if it can, by any fair means, what that process is, and, when discovery is thus made, to employ it in the manufacture of similar articles. In such case the inventor's or manufacturer's property in his process is gone, but the authorities all hold that, while knowledge obtained in this manner is perfectly legitimate, that which is obtained by any breach of confidence cannot be sanctioned; and this distinction is quite forcibly presented in a recent decision of the Court of Appeals, to which the attention of this court has been directed by the supplemental brief of defendants. Judge LANDON, in his opinion, speaking of the plaintiff's claim, says: "His case is unlike those in which the injunctive process of the court is sought

to restrain the disclosure of a secret, or the publication of a letter, which may prove injurious to business or character." (*Bristol* v. *Equitable Life Assurance Society*, 132 N. Y. 264–267.) But, without multiplying citations or prolonging consideration of the legal aspect of this case, it may be said by way of conclusion that the principle contended for by the plaintiff is not only abundantly supported by authority, but is likewise founded on good common sense, and is peculiarly applicable to the case in hand. Here is a party which, by the expenditure of vast sums of money and the exercise of much skill and ingenuity, has built up a large and prosperous business, the capital of which consists largely in certain inventions and discoveries made by its officers, servants and agents. The world at large knows nothing of these inventions and discoveries, because they are locked within the brain of those who conceive them. The defendants, who have been largely instrumental in perfecting them, while under both an express and implied contract to give the plaintiff the benefit of their inventive genius, propose now to disregard their legal and moral obligations by creating a new establishment where these inventions and discoveries may be employed to plaintiff's serious injury. This is not legitimate competition, which it is always the policy of the law to foster and encourage, but it is *contra bonos mores*, and constitutes a breach of trust which a court of law — and much more a court of equity — should not tolerate. It follows, therefore, that the plaintiff is entitled to the relief sought by this action, certainly as against the defendants Reichenbach and Passavant; and, as the defendant Milburn has allowed himself to engage in an illegitimate enterprise, with knowledge of or the means of knowing what its operation involves, I can see no good reason why he should not be subjected to the same restraining process as his co-defendants. Judgment is accordingly directed against all three defendants, with costs of the action.