689 F.2d 424
 215 U.S.P.Q. 1081
 ROHM AND HAAS COMPANY, a corporation,
v.
ADCO CHEMICAL COMPANY, a corporation, and the Thibaut &
Walker Company, Inc., a corporation.
Appeal of ROHM AND HAAS COMPANY.
 No. 82-5000.
 United States Court of Appeals,
Third Circuit.
 Argued July 29, 1982.
Decided Sept. 21, 1982.
 
 Rudolf E. Hutz (argued), James M. Mulligan, Jr., Paul E. Crawford, Connolly, Bove & Lodge, Wilmington, Del., for appellant; George W. F. Simmons, Michael B. Fein, Rohm and Haas Co., Philadelphia, Pa., of counsel.
 Lawrence F. Scinto (argued), Fitzpatrick, Cella, Harper & Scinto, New York City, for appellees; Edward E. Vassallo, Nels T. Lippert, New York City, of counsel.
 Before GIBBONS, HUNTER, Circuit Judges and POLLAK,* District Judge.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge.
 
 INTRODUCTION
 
 1
 This case involves a process which plaintiff uses in the manufacture of its "second generation" latex paint products. Plaintiff claimed below that its process was a trade secret which was misappropriated by the defendants. Plaintiff also claimed that defendants infringed Patent No. 2,795,564 dealing with plaintiff's "first generation" latex paint products. Defendants counterclaimed, charging plaintiff with unfair competition. The district court held the patent either invalid or not infringed, and denied all other claims of both parties. The only issue raised on appeal is the propriety of the district court's denial of relief on the trade secret claim.
 
 
 2
 We conclude that the district court erred in its application of law to the trade secret claim. We will reverse the court's decision, and remand solely for a determination of the appropriate relief.
 
 FACTS
 
 3
 Prior to the development of the process claimed to be a trade secret, plaintiff had sold latex paint vehicles[1] made using a process disclosed in Patent No. 2,795,564. In 1955 plaintiff embarked on a research campaign to develop a "second generation" latex paint vehicle "with improved qualities." App. at 1083-92. As the result of a seven year effort, plaintiff developed the process involved here (the "Process"), which plaintiff used in producing a paint vehicle with the desired qualities.[2] Plaintiff used this vehicle in the manufacture of four highly successful products. Other manufacturers have tried to offer vehicles competitive with plaintiff's second generation vehicle, but failed. App. at 577-78. The defendants alone have been able to market vehicles with the same desirable qualities. App. at 362-65, 377, 579-81. Plaintiff contends that only revelations by one of plaintiff's former employees, Joseph Harvey, enabled defendants to produce these vehicles.
 
 
 4
 Joseph Harvey joined plaintiff in 1959 as a laboratory technician. From the outset of his employment, Harvey worked under plaintiff's scientists in the development of latex paints, including those incorporating the Process involved here. Plaintiff's laboratory notebooks in Harvey's handwriting contain repeated descriptions of the Process which Harvey carried out pursuant to plaintiff's instructions. Harvey's duties also gave him access to plaintiff's commercial process descriptions which detailed the Process.
 
 
 5
 In March 1967 Harvey signed an employment agreement in which he acknowledged that "any business or trade secrets, including secret processes of manufacture of Rohm and Haas Company, are the property of Rohm and Haas Company" and agreed "not to divulge such information to outsiders or other unauthorized persons either while employed by Rohm and Haas Company or afterwards." App. at 1416. During Harvey's tenure at Rohm and Haas, extensive security measures were in effect which Harvey acknowledged were intended to "keep the secrets in." App. at 1121-26, 1405-07. Harvey was reminded at his exit interview in June 1967 that he possessed confidential information and that he should contact plaintiff if he had any question concerning the extent of his obligation to preserve confidentiality. App. at 119-20. Harvey never contacted plaintiff. App. at 1122.
 
 
 6
 Defendants, Adco and Thibaut & Walker, are related corporations engaged in the manufacture and sale respectively of various chemicals. In 1968 defendants initiated a program to copy two of plaintiff's products which were made using the Process. App. at 344-47, 1214-15. To accomplish this task, defendants hired a Ph.D. chemist, Victor Meyer, whom defendants had retained as an independent consultant since 1963. App. at 406, 409-11.
 
 
 7
 After nearly two years of work, Dr. Meyer advised defendants that he had successfully developed a match for plaintiff's products. Defendants, based on this report, prepared an advertising and promotional campaign for their matching products. In September 1970 Dr. Meyer attempted to implement the process he had developed on a commercial scale. This attempt failed. Nevertheless, defendants promoted their matching products at an October 1970 paint show. At this show and during this period, defendants represented to the trade that their matching products were available. In order to fill orders from customers based on these representations, defendants purchased plaintiff's products, repackaged them as their own, and sold them without informing customers of the substitution. App. at 429-41. Defendants made the acquisition of a "match" for plaintiff's products their highest priority. App. at 1240.
 
 
 8
 During the October 1970 paint show, defendants' president was referred by a former employee of the plaintiff to Joseph Harvey, who was seeking employment at the time. App. at 453, 1361. Defendants' president immediately contacted Harvey, and, after one interview, Harvey was hired by defendants to develop latex paint compounds, including acrylics. App. at 1366-67.[3]
 
 
 9
 Harvey began work on November 17, 1970. His first assignment was to duplicate one of plaintiff's products made using the Process which had been the object of Dr. Meyer's research efforts. App. at 459. During his first week at work and without assistance, Harvey prepared a laboratory replication of the product; the first entry in the laboratory notebook which Harvey maintained for the defendants was the complete Process which Harvey had learned for making plaintiff's products. App. at 1111-1114, 1382-87. Harvey stated in his deposition:
 
 
 10
 Q: This process that is referred to at pages 4 through 6 of your (Adco) notebooks, that process did not come from Dr. Meyer at all, did it?
 
 
 11
 Harvey: No.
 
 
 12
 Q: This was a Rohm and Haas process, Mr. Harvey?
 
 
 13
 Harvey: Yes.
 
 
 14
 App. at 1387. Later in his deposition Harvey made clear that the "Harvey process" was one he had learned at and brought from Rohm and Haas. App. at 1393, 1396-97.
 
 
 15
 Harvey soon revealed his process to defendants. Defendants never asked Harvey about the origin of the "Harvey process." App. at 1413. Within a few weeks defendants sent samples to prospective customers and ordered Harvey to duplicate the "Harvey process" on a commercial scale. App. at 481-83, 792, 1393. Harvey's attempt to do so proved unsuccessful due to his own mathematical errors. Because Harvey had no idea what was wrong, defendants called in Dr. Meyer and others to make the "Harvey process" work. One of those called in testified:
 
 
 16
 Q: In those discussions that you had with Mr. Harvey, was it apparent to you that Mr. Harvey knew a formula but knew nothing with respect to what made it work, or why it worked, or what its variances would be?
 
 
 17
 A: I'd agree with that.
 
 
 18
 App. at 554-57.
 
 
 19
 Defendants subsequently were successful in duplicating the "Harvey process" on a commercial scale, and the Meyer process was set aside. App. at 481-486, 1252-54. By mid-1971 defendants were selling duplicates of plaintiff's products using the "Harvey process." App. at 1396-98. Plaintiff filed suit in October, 1971.
 
 THE DECISION BELOW
 
 20
 After a nine-day trial, the district court issued a seventy-five page opinion. 213 U.S.P.Q. (BNA) 723 (D.N.J.1981). The court devoted roughly seven pages to plaintiff's trade secret claim, the remainder being devoted to plaintiff's patent and defendants' unfair competition claims. The court rejected the trade secret claim, stating that plaintiff had failed to show that the Process was a trade secret. Id. 213 U.S.P.Q. (BNA) at 751-53. Plaintiff appeals.
 
 DISCUSSION
 A. The Choice of Law
 
 21
 Before this court considers plaintiff's contentions on appeal, we conclude that the district court erred in determining the applicable law. The district court concluded that federal common law governed the trade secret claim and looked to Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1976), for the content of that law. 213 U.S.P.Q. (BNA) at 750. The Supreme Court in Kewanee Oil, however, did not establish a federal common law governing trade secrets. It merely described the trade secret law of Ohio in the course of holding that law constitutional. 416 U.S. at 493, 94 S.Ct. at 1891. A trade secret claim in the federal courts is governed not by federal common law but by state law. This is true regardless of whether jurisdiction is based upon diversity of citizenship, Pecheur Co. v. National Candy Co., 315 U.S. 666, 667, 62 S.Ct. 853, 853, 86 L.Ed. 1103 (1942), or on pendency to a patent claim under 28 U.S.C. § 1338(b) (1976). Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774, 780-81 (2d Cir. 1964), cert. denied, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965); Kemart Corp. v. Printing Arts Research Laboratories, 269 F.2d 375, 389-90 (9th Cir.), cert. denied, 361 U.S. 893, 80 S.Ct. 197, 4 L.Ed.2d 151 (1959).[4]
 
 
 22
 Because of its error, the district court never considered the question of which state's law governs the trade secret claim in this case. To make this choice of law, a federal court whose jurisdiction over a state claim is based on diversity, Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496-97, 61 S.Ct. 1020, 1021-1022, 85 L.Ed. 1477 (1941), or on pendency to a federal claim, Systems Operations, Inc. v. Scientific Games Development Corp., 555 F.2d 1131, 1136 (3d Cir. 1977), must apply the conflicts of law principles of the forum state. New Jersey, the forum state in this case, has abandoned the traditional rule in tort cases that the law of the place of wrong governs. Rose v. Port of New York Authority, 61 N.J. 129, 139-40, 293 A.2d 371, 376 (1972). Instead, it looks to the law of the jurisdiction "having the most significant relationship and closest contacts with the occurrence and the parties." Id. at 140, 293 A.2d at 377 (citations omitted); see Henry v. Richardson-Merrell, Inc., 508 F.2d 28, 32 (3d Cir. 1975).
 
 
 23
 Both Pennsylvania and New Jersey have close contacts with the parties and occurrences in this case. Pennsylvania is plaintiff's principal place of business, and is where Harvey was employed and allegedly learned in confidence the trade secret of the plaintiff. New Jersey is the state of incorporation and principal place of business of the defendants, and is where the trade secret allegedly was revealed to and exploited by the defendants.
 
 
 24
 We need not decide which state has the closer contacts, and more significant relationship, sufficient to warrant the application of its law to the facts of this case. Our examination of the law of trade secrets of both Pennsylvania and New Jersey shows that application of the law of each state to the facts of this case leads to the same outcome. When such a "false conflict" exists, New Jersey conflicts of law rules permit the resolution of the case without a choice between the laws of the two states. Systems Operations, 555 F.2d at 1136; Pfau v. Trent Aluminum Co., 55 N.J. 511, 527, 263 A.2d 129, 136 (1970).
 
 B. The Elements of a Trade Secret Claim
 
 25
 The plaintiff claimed that its trade secret was misappropriated with the help of its former employee by its competitors. The law of both Pennsylvania and New Jersey establish five basic elements of the claim: (1) the existence of a trade secret, (2) communicated in confidence by the plaintiff to the employee, (3) disclosed by the employee in breach of that confidence, (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff. Stone v. Goss, 65 N.J.Eq. 756, 759-60, 55 A. 736, 737 (1903); Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 85-87, 92, 86 A. 688, 691 (1913); see Ferroline Corp. v. General Aniline & Film Corp., 207 F.2d 912, 921 (7th Cir. 1953) (applying N.J. law), cert. denied, 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954).
 
 
 26
 In addition, both New Jersey and Pennsylvania trade secret cases mention differing supplemental elements of a trade secret claim. New Jersey requires that the plaintiff show that he took precautions to maintain the secrecy of the trade secret. Sun Dial Corp. v. Rideout, 16 N.J. 252, 260, 108 A.2d 442, 447 (1954). See Carver v. Harr, 132 N.J.Eq. 207, 209, 27 A.2d 895, 897 (1942). Pennsylvania requires that the plaintiff show that the trade secret is of value to him and is important in the conduct of his business, and that the plaintiff has a right to the trade secret by reason of discovery or ownership. Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 259, 213 A.2d 769, 775 (1965).
 
 
 27
 The district court held that plaintiff failed to establish one element of his claim-the existence of a trade secret. Before we address this holding, it should be noted that plaintiff had proven at trial beyond any serious dispute all of the other elements of his trade secret claim.
 
 
 28
 First, plaintiff met his burden of proving the supplemental elements of his claim imposed by New Jersey or Pennsylvania law. Plaintiff showed that it had discovered the Process and retained all rights to it. The Process was of great value and importance to plaintiff, serving as the basis of four highly successful products. Plaintiff showed that it took extensive security measures to prevent the disclosure of the Process and its other secrets.
 
 
 29
 Second, plaintiff showed that it disclosed the Process to Harvey in confidence. Plaintiff put in evidence its security arrangements, the employment agreement signed by Harvey, and the warnings given to Harvey concerning the secret nature of his work. This undisputed evidence leaves little doubt that plaintiff's revelation of the Process to Harvey carried with it an obligation to preserve its confidentiality.
 
 
 30
 Third, plaintiff showed that Harvey revealed the secret in violation of his duty to preserve its confidentiality. Harvey's own admissions, unanswered by the defendants, establish that the "Harvey process" which he wrote in the first entry of his Adco notebook was nothing more than his recollection of the Process he had learned in plaintiff's employ. Harvey's disclosure of the Process to defendants necessarily constituted a breach of the confidence plaintiff had reposed in him.
 
 
 31
 Fourth, plaintiff established that the secret was acquired by defendants with knowledge that its revelation was wrongful. Defendants argued that they had no knowledge that Harvey's disclosure was a breach of his pledge of secrecy to plaintiff. They assert that plaintiff has the burden of proving that defendants acquired the Process as knowing participants in the breach of trust, citing Ferroline Corp., 207 F.2d at 922-23. Plaintiff did not attempt to meet its burden by direct evidence showing defendants' lack of good faith. The absence of direct evidence, however, "does not prevent our reaching the conclusion that the defendant(s) had such knowledge, if such is the inference to which the testimony, by irresistible weight of probability tends." Vulcan Detinning Co. v. American Can Co., 72 N.J.Eq. 387, 399, 67 A. 339, 344 (1907); Greenberg v. Croydon Plastics Co., 378 F.Supp. 806, 814-15 (E.D.Pa.1974) (applying Pa. law). Such an inference was unavoidable here given the undisputed facts. Defendants knew that plaintiff, and only plaintiff, made a latex paint vehicle superior to their own. They had tried for years, unsuccessfully, to duplicate plaintiff's method of manufacture. They hired a person who had been an employee of the plaintiff and immediately set him to duplicating plaintiff's product. The employee handed them the Process for making one of plaintiff's products almost as soon as he walked in the door. They knew that the employee's experience with latex acrylics could have come only from his time in plaintiff's employ. They were acquainted with the confidential nature both of plaintiff's business and of plaintiff's relation to its employees. These facts left it all but impossible to avoid the conclusion that defendants knew Harvey had revealed to them something that plaintiff had tried very hard to keep secret. See Vulcan Detinning Co., 72 N.J.Eq. at 398-399, 67 A. at 344; Stone v. Goss, 65 N.J.Eq. 756, 761-62, 55 A. 736, 737-38 (1903). At the very least, the circumstances should have put defendants upon inquiry. Defendants never asked where the "Harvey process" had come from. Defendants therefore were charged "with whatever knowledge such inquiry would have led to." Vulcan Detinning Co., 72 N.J.Eq. at 401, 67 A. at 345.
 
 
 32
 Fifth, plaintiff established that defendants used the secret to the detriment of plaintiff. There is no dispute that defendants used the Process divulged by Harvey to compete against plaintiff by putting on the market two products touted as duplicates of plaintiff's products. Defendants continued to use the Process until at least the initiation of this suit.
 
 
 33
 Thus there is no dispute that plaintiff had established at trial all of these elements of its trade secret claim. The only element remaining is the existence of a trade secret. The district court held that plaintiff had not shown that the Process was a trade secret. We find no legal support for that holding.
 
 C. The Existence of a Trade Secret
 
 34
 New Jersey and Pennsylvania have adopted the definition of a trade secret provided in the Restatement of Torts:
 
 
 35
 A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.
 
 
 36
 Id., § 757 comment b (1939); Sun Dial Corp. v. Rideout, 16 N.J. 252, 257, 108 A.2d 442, 445 (1954); Felmlee v. Lockett, 466 Pa. 1, 9, 351 A.2d 273, 277 (1976). Both states require the information to be the secret of a particular employer and not a matter of general knowledge in the industry. Sun Dial Corp., 16 N.J. at 257, 108 A.2d at 445; Bettinger v. Carl Burke Associates, 455 Pa. 100, 106, 314 A.2d 296, 299 (1974).
 
 
 37
 As we have stated above, plaintiff proved that it used the Process in its business to obtain a distinct advantage over its competitors, including defendants. The district court acknowledged the competitive value of the Process in its finding that "some kind of useful information was inevitably obtained (by the defendants) out of the hiring of Joseph Harvey." 213 U.S.P.Q. (BNA) at 755. Nonetheless, the district court held that the plaintiff had failed in its attempt to show that the Process was not a matter of general knowledge within the industry.
 
 
 38
 Plaintiff's proof that the Process was its secret consisted of demonstrating by the realities of the marketplace that this valuable method of producing latex paint vehicles was unknown to its competitors. Apart from defendants, plaintiff was the only manufacturer to use the Process and as a result it could offer four superior products. Other competitors had tried and failed to put competing products on the market. Defendants' Dr. Meyer, a Ph.D. chemist, had been unable over the course of two years to develop competing products without plaintiff's Process. Defendants' expert admitted that the publications claimed to reveal the elements of the Process were unknown both to defendants and to him prior to this lawsuit, App. at 638-39, leaving no reason to suspect that defendants could have duplicated the Process through skill and effort using the available literature.[5] Only after defendants acquired the "Harvey process" could they field a match for the plaintiff's products. None of these facts were seriously contested by the defendants below, and none turned on a question of the credibility of witnesses.[6]
 
 
 39
 Under both New Jersey and Pennsylvania law, these facts were sufficient to establish that the alleged secret is in fact the secret of a particular employer, and not a matter of general knowledge within the industry. Sun Dial Corp., 16 N.J. at 258-59, 108 A.2d at 446; Belmont Laboratories v. Heist, 300 Pa. 542, 550, 151 A. 15, 17-18. Plaintiff, having thus proven the existence of a trade secret as well as every other element of his trade secret claim, was entitled to relief.
 
 
 40
 The district court nonetheless concluded that the Process was a matter of general knowledge in the industry. It gave two grounds for its conclusion. First, it held that the plaintiff had not defined its alleged trade secret sufficiently to remove it from "the kind of information that goes with knowledge, skill and experience in the field (that) is more likely to accompany the employee without protection." 213 U.S.P.Q. (BNA) at 751. Second, the district court held that most if not all of the elements of plaintiff's Process were "long and widely known in the trade." 213 U.S.P.Q. (BNA) at 752.
 
 
 41
 We conclude that the district court erred in rejecting plaintiff's proof that the Process is a trade secret. Both of the grounds set forth are legally inadequate to defeat plaintiff's claim for relief.
 
 
 42
 The first ground offered by the district court is that plaintiff failed to adequately define its alleged secret.[7] The district court cited no Pennsylvania or New Jersey law imposing any particular standard for definition.[8] Rather, the district court used this definitional "requirement" as a surrogate for the inquiry into whether the alleged secret was "knowledge, skill and experience in the field (that) is more likely to accompany the employee without protection." 213 U.S.P.Q. (BNA) at 751. We prefer to address this inquiry directly.
 
 
 43
 Both Pennsylvania and New Jersey hold that the "general knowledge, skill and experience" gained by an employee during his employment cannot be claimed as a trade secret by his employer. Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 260, 213 A.2d 769, 776 (1976); Boost Co. v. Faunce, 17 N.J.Super. 458, 464, 86 A.2d 283, 286 (1952). The district court did not find as a fact that the Process was part of Harvey's general knowledge, skill or experience. Instead, it made a legal inference from what it saw as the inadequate definition of the Process that the "secret" probably fell within Harvey's expertise.
 
 
 44
 In Schultz v. Wheaton Glass Co., 421 F.2d 259 (3d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970), this court held that it was not "bound by evidence which has not reached the status of a finding of fact, nor by conclusions which are but legal inferences from facts." Id. at 276 (citations omitted). We decline to be so bound here. The legal inference made by the district court is at odds with the facts. Harvey himself admitted that his swift "discovery" of the "Harvey process" was the result not of any heightened chemical prowess, but of his recollection of plaintiff's Process.[9] Harvey's background and the testimony of defendants' agent as to Harvey's grasp of the "Harvey process," supra, leave little doubt that memory, not ability, was the source of Harvey's revelation. On this record, regardless of the specificity of plaintiff's definition of its trade secret, the legal conclusion drawn by the district court is without basis, and is thus an error of law.
 
 
 45
 The district court offered a second ground to justify its denial of relief to plaintiff. It held that because defendants had shown that some or all of the individual elements of plaintiff's Process were widely known in the trade, the Process itself as a matter of law must be considered to be general knowledge. 213 U.S.P.Q. (BNA) at 751-53.[10]
 
 
 46
 The trade secret law of Pennsylvania and New Jersey is directly contrary to the legal conclusion drawn by the district court. The law of these states provides that even though each and every element of plaintiff's Process is known to the industry, the combination of those elements may be a trade secret if it "produces a product superior to that of competitors." Sun Dial Corp. v. Rideout, 16 N.J. 252, 257-58, 108 A.2d 442, 445-46 (1954); Anaconda Co. v. Metric Tool & Die Co., 485 F.Supp. 410, 422 (E.D.Pa.1980) (applying Pa. law); Belmont Laboratories v. Heist, 300 Pa. 542, 550-51, 151 A. 15, 18 (1930). Plaintiff proved that the Process produced a superior product. The district court's second ground for concluding that plaintiff's Process was widely known in the industry, based on a misreading of the applicable law, thus is erroneous.
 
 
 47
 The district court denied plaintiff's claim only by imposing these additional and incorrect legal standards of secrecy on the plaintiff's trade secret. Reversal of the district court and remand for the entry of judgment for the plaintiff is therefore appropriate. Borough of Ford City v. United States, 345 F.2d 645, 651 (3d Cir. 1964), cert. denied, 382 U.S. 902, 86 S.Ct. 236, 15 L.Ed.2d 156 (1965).[11]
 
 D. Nature of the Available Relief
 
 48
 On remand, the district court must determine the appropriate relief. Plaintiff's amended complaint prays for a permanent injunction restraining the defendants from using or disclosing to others plaintiff's trade secret. Under both New Jersey and Pennsylvania law, plaintiff is entitled to such an injunction. Vulcan Detinning Co. v. American Can Co., 72 N.J.Eq. 387, 402, 67 A. 339, 345-46 (1907); Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 86, 86 A. 688, 693 (1913).
 
 
 49
 Plaintiff's amended complaint also seeks an accounting of the damages suffered by plaintiff and the profits made by defendants because of their wrongful appropriation of plaintiff's trade secret. It appears that both New Jersey and Pennsylvania permit the recovery of defendants' profits or plaintiff's damages resulting from defendants' wrongs. Smith v. Dravo Corp., 203 F.2d 369, 378 (7th Cir. 1953) (applying Pa. law); Greenberg v. Croydon Plastics Co., 378 F.Supp. 806, 816-17 (E.D.Pa.) (applying Pa. law), order vacated, 184 U.S.P.Q. (BNA) 27 (E.D.Pa.1975); Consolidated Boiler Corp. v. Bogue Electric Co., 141 N.J.Eq. 550, 570, 58 A.2d 759, 772 (Ch.1948), cited in Adolph Gottscho, Inc. v. American Marking Corp., 26 N.J. 229, 240, 139 A.2d 281, 287 (1958); see Restatement of Torts § 757 comment e (1939).[12]
 
 
 50
 Defendants urge on us two grounds for limiting the relief otherwise available to the plaintiff. First, they allege that a foreign patent, issued after Harvey's disclosure and unknown to the defendants prior to the initiation of this suit, revealed the entire Process and terminated plaintiff's right to relief. Brief of Appellees at 45-49. Second, defendants contend that after plaintiff brought this suit they "made a good faith effort" to change their process from that disclosed to them by Joseph Harvey. Brief of Appellees at 34-35. Plaintiff challenges both the factual and legal foundations of defendants' assertions.
 
 
 51
 Both of the defendants' contentions have little foundation under the law of either New Jersey or Pennsylvania. On the first ground, the New Jersey Supreme Court has held that the publication of plaintiff's secret in patents issued after defendant had misappropriated it did not deprive plaintiff of his pre-existing cause of action or of his right to complete injunctive and monetary relief against the wrongdoer. Adolph Gottscho, Inc. v. American Marking Corp., 18 N.J. 467, 472-75, 114 A.2d 438, 440-442, cert. denied, 350 U.S. 834, 76 S.Ct. 70, 100 L.Ed. 744 (1955).[13]
 
 
 52
 On the second ground, New Jersey law states that a company misappropriating a trade secret may lose the benefits of its future independent experiments because of the difficulty of determining how much of the improvement is attributable to those independent efforts and how much to the information gained by the wrongdoing. Stone v. Goss, 65 N.J.Eq. 756, 762, 55 A. 736, 738 (1903). This principle applies to injunctive relief, id., and to damages, Midland-Ross Corp. v. Yokana, 293 F.2d 411, 414 (3d Cir. 1961) (applying N.J. law). In trying to segregate honest efforts and ill-acquired knowledge, "(e) very doubt must be resolved against the parties to a fraudulent act." Stone v. Goss, 65 N.J.Eq. at 762, 55 A. at 738.
 
 
 53
 Under Pennsylvania law, defendants' second contention has little merit. Defendants may produce their "match" for plaintiff's products "if they discover a new process entirely different from the secret process;" use of a "practically similar process" is forbidden. Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 92-93, 86 A. 688, 693 (1903); see Belmont Laboratories v. Heist, 303 Pa. 7, 9, 154 A. 17, 18 (1931). Doubts are resolved against the wrongdoer. Newcomer v. South Fayette Coke Co., 317 Pa. 108, 112, 176 A. 228, 229 (1934).
 
 
 54
 We do not address the defendants' contentions on appeal. We leave these contentions, if renewed on remand, to the consideration in the first instance of the district court.
 
 
 55
 The judgment of the district court will be reversed. The case will be remanded for entry of judgment for plaintiff and for proceedings consistent with this opinion to grant the plaintiff all relief to which it is entitled.
 
 
 
 *
 Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Appellant's Brief explains:
 A paint vehicle is the liquid portion of the paint and it is usually colorless. Pigment is added to the vehicle for coloration. The vehicle is a two component substance, i.e., thinner and binder. The thinner is the volatile component of the paint-water in the case of latex paints-which evaporates when the paint dries, leaving behind the solid paint film. The binder is the non-volatile component of the vehicle which functions to bind the pigment particles into a uniform paint film and to adhere the film to the surface being painted.
 Brief for Appellant at 5 n. 2.
 
 
 [2]
 In light of the confidential nature of the claimed trade secret, the discussion of the Process in this opinion will not go into detail unnecessary to the decision of the case
 
 
 [3]
 Defendants knew at the time of the hiring that Harvey was not a college graduate, that he had been fired from one of the two jobs he had held since leaving plaintiff, and that he had been unemployed for long periods. App. at 457-458, 460-61, 1369. Defendants also knew that Harvey had been employed by plaintiff in its research laboratories working on acrylic latex technology. App. at 462-64, 1362-66. Defendants were also aware that plaintiff was the only company for which Harvey had performed work relating to acrylic latexes. App. at 464-66. Defendants offered Harvey a job at a salary nearly twenty-five percent higher than he had previously earned. App. at 1402
 
 
 [4]
 The district court based its jurisdiction over plaintiff's trade secret claim on 28 U.S.C. § 1338(b) (1976). This subsection confers jurisdiction on the district court to consider a claim of unfair competition, such as misappropriation of a trade secret, when joined with a "substantial and related claim" under the patent laws. Id. The district court's holding that plaintiff's patent was either invalid or not infringed did not necessarily deprive the district court of jurisdiction under § 1338(b). O'Brien v. Westinghouse Electric Co., 293 F.2d 1, 11 (3d Cir. 1961). Jurisdiction continues to exist over the claim of unfair competition unless the unsuccessful patent claim was unrelated or insubstantial. Id. at 10-11
 Plaintiff in its amended complaint and on appeal stated that subject matter jurisdiction was grounded on diversity of citizenship. 28 U.S.C. § 1332(a) (1976). Plaintiff is incorporated in Delaware and has its principal place of business in Pennsylvania. Both defendants are incorporated and have their principal place of business in New Jersey. The amount in controversy exceeds $10,000.
 
 
 [5]
 Harvey, too, admitted that he had not consulted the publication which he believed revealed the Process before he divulged the Harvey process to the defendants. App. at 1412
 See Heyden Chemical Corp. v. Burrell & Neidig, Inc., 2 N.J.Super. 467, 471, 64 A.2d 465, 467 (1949) ("The truth is, of course, that only a person who knew the ... process could make the selection of literature references which were offered in evidence.").
 
 
 [6]
 The district court made two findings on credibility. First, as mentioned in note 9, the district court found credible Harvey's assertion that he did not believe the information he revealed was a trade secret. Harvey's innocence of mind, even if believed, is not inconsistent with the facts as stated in the text. Second, the trial court, while it found plaintiff's expert to be truthful on the facts, had more confidence in defendants' expert. In reaching our decision, we have put no reliance on the opinion testimony of plaintiff's expert
 
 
 [7]
 It appears from our examination of the record that plaintiff did put in evidence detailed descriptions of the Process, App. at 820-37, 860-68, which were incorporated by reference in its trial testimony. Id. at 849, 853. Moreover, defendants' expert testified that he understood plaintiff's statement of its claimed trade secret. Id. at 628
 
 
 [8]
 The only case cited by the district court, Atlantic Wool Combing Co. v. Norfolk Mills, 357 F.2d 866 (1st Cir. 1966), expresses no legal requirement for the definition of trade secrets. Our own search has turned up no Pennsylvania or New Jersey cases mandating a minimum level of definition
 
 
 [9]
 Harvey stated in his deposition that he did not believe that the Process he recalled for the defendants was plaintiff's trade secret only because he assumed that the Process was sufficiently disclosed in the literature. Appendix at 1404, 1412. The district court apparently found his statement credible, saying "the court doubts that (Harvey's revelations) included anything that he consciously realized was information not known elsewhere." 213 U.S.P.Q. (BNA) at 755. Harvey's good faith belief, even if credited, is no defense to an action for misappropriation of trade secrets. Restatement of Torts § 757 comment g (1939)
 
 
 [10]
 It should be noted that the district court did not make a finding of fact that the Process, rather than its elements, was widely known in the industry, nor did defendants so claim. Defendants' expert admitted on cross-examination that the publications cited to show public knowledge of the elements of the Process did not reveal all of the Process. E.g., App. at 657, 665-69, 683-85. Harvey stated that he could name no source that disclosed the Process "in its entirety." App. at 1412
 
 
 [11]
 Plaintiff as its second ground for reversal argued that the decision below was devoid of findings and thus violated Fed.R.Civ.P. 52(a). Because of our disposition of the case, we have no cause to address this contention
 
 
 [12]
 Plaintiff's amended complaint also seeks punitive damages, attorneys fees and costs. We remand these requests for consideration by the district court
 
 
 [13]
 Pennsylvania appears to have no cases dealing with the defendants' first contention. In Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 266-268, 213 A.2d 769, 778-80 (1965), Pennsylvania held that public disclosure by the plaintiff of his trade secret destroys plaintiff's right to relief against the wrongdoer. Defendants cite other cases reaching this same holding. These cases do not tell us what the Pennsylvania Supreme Court would do in a case where it was a third party whose patent allegedly revealed the secret and where plaintiff had not done anything to jeopardize his claim against one who earlier stole information from him and who had profited and continued to profit from his wrongdoing